

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**FILED**
February 21, 2008
CLERK

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| DAVID L. GEORGE, | * | CIV. 06-4263 |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | REPORT and RECOMMENDATION |
| | * | |
| MICHAEL J. ASTRUE[1], | * | |
| Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Plaintiff seeks judicial review of the Commissioner's final decision denying him a period of disability commencing on July 1, 2000[2], and payment of disability insurance and medical benefits under Title II and Title XVII of the Social Security Act.[3] The Plaintiff has filed a Complaint and

---

[1] Michael J. Astrue was appointed Commissioner of the Social Security Administration on February 12, 2007. Pursuant to 42 U.S.C. 405(g) and Fed. R. Civ. P. 25(d)(1), he has been substituted as the Defendant in this action.

[2] Plaintiff was involved in a serious motorcycle accident in 1984. It is noted in the ALJ's decision that the Plaintiff filed a previous application for, and received, SSI benefits from September 4, 1984 through 1988, when he returned to work. Plaintiff engaged in substantial, gainful activity for several years, but then alleged a disability onset date of July 1, 2000 in connection with the current claim. The ALJ explained, therefore, that re-opening the previous claim was not appropriate–a claim which the Plaintiff does not dispute. *See* 20 C.F.R. § 416.1487.

[3] SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon his "coverage" status (calculated according to his earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, the Plaintiff filed his application for both types of benefits at the same time (March 16, 2004). AR 55-57, 323-25. Mr. George's "date last insured" for SSD/DIB ("Title

has requested the Court to enter an order instructing the Commissioner to award benefits. The matter is fully briefed and has been referred to the Magistrate Judge for a Report and Recommendation. For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be REVERSED AND REMANDED with instructions for an award of benefits in the amount required under applicable statutes and regulations..

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and a Standing Order dated November 29, 2006.

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed his application for benefits on March 18, 2004. AR 55-57, 323-25. In a form entitled "Disability Report–Adult" he filed in connection with his disability application (AR 75-86). Plaintiff listed the following as illnesses, injuries or conditions that limited his ability to work: "ADD." AR 76. In two handwritten pages attached to the form, however, he expanded further on his claims: "physical condition 1. Pain is neer (sic) constantly in hip, elbow, left sholder (sic) cup (i.e.) if I sit for long time or if I walk for long time my hip will hurt even more. (I.e.) My elbow gets tight if I use it much it feels like it has a headache in my elbow. (I.e.) I was told that because I have used my sholder (sic) in place of my elbow I have worn down my sholder (sic) cup–have had physical therapy but was unable to complete. (I.e.) My right knee has failed me due to overuse. My left knee.  Panac (sic) disorder. I have experianced (sic) tightening in my chest area with a painfull (sic) sensation. I think perhapst (sic) having heart problems.  It causes me to sweat & I have fear its like the fealing (sic) of beeing (sic) totaly (sic) scared with an adrenalyn (sic) rush.  I feel like I'me (sic) loosing (sic) control and I don't want others to know so I lieve (sic) wearever (sic) I am as fast as I can. I try to get to a bathroom & lock the door. My breathing gets rapid.  From my experiance (sic) I have learned that all will go away in time.  Sometimes within 10 min and other times it may

_____

II") benefits is June 30, 2005. *See* AR 14, 82, 338.

last up to 30 min.  I never know when I hay have a panac (sic) rush but it has happend while driving in traffic, while in public, during times while I was working.  I keep myself away from imbarrising (sic) situations.  I am always afraid of the next eposode (sic).  I don't care to go anyplace & I stay to home with my parrants (sic) as much as possible.

Plaintiff's claim was denied initially on August 9, 2004   (AR 39, 327), and on reconsideration on January 3, 2005 (AR 45, 332).  He requested a hearing (AR 47) and a hearing was held in Aberdeen, South Dakota on March 10, 2006, before Administrative Law Judge (ALJ) the Honorable James Geyer.  AR 334-412.  On May 22, 2006, the ALJ issued an eleven page, single-spaced decision affirming the previous denials.  AR 14-24.  On June 20, 2006, Attorney McCrary sent a "Request for Review of Hearing Decision/Order" to the Appeals Council requesting review of the ALJ's decision.  AR 10.  An extension of time to submit further evidence to the Appeals Council was granted on September 2, 2006.  AR 8.  No further evidence was submitted, and the Appeals Council denied review on November 6, 2006.  AR 5-7.  Plaintiff then timely filed his Complaint in the District Court on December 11, 2006.

## **FACTUAL BACKGROUND**

David George  was born on in 1965 and was 40 years old at the time of the administrative hearing. AR 338.  He completed the tenth grade, and never received his GED. AR 339.  He tried to obtain his GED but was unsuccessful.  AR 340.   His past job experience includes working as an order picker at a warehouse, a sales representative for a home improvement company, a self-employed disc-jockey, an appointment setter for a home improvement company, and a sales representative for a radio station. TR 148. Mr. George  asserts he became disabled in July of 2000 and has not worked full-time since then.  AR 343.  He did work part-time for one month in 2003 as a bartender, but he quit that job because of panic attacks.  TR 108, 342.

### A.    **Medical Conditions and Treatment**

Mr. George  was involved in a motorcycle accident in 1984 and suffered a femur fracture,

3

fractures of the iliac wing, and an open fracture dislocation of the left elbow. AR 233.[4] He spent four months in the hospital, and passenger on the motorcycle died. AR 233, 369.

### 1.   Dr. Randall Chadwick/Allina Medical Clinic

According to Dr. Randall Chadwick, the injury to Mr. George's left elbow resulted in, among other things, internal fixation and marked contracture with posterior subluxation of the ulna and incongruity in the radiocapitellar joint. AR 157. As a result, Mr George had almost no pronation/supination, and his flexion-extension arc was limited to 40 to 80 degrees. *Id*. In 1998, Mr. George underwent ulnohumeral arthroplasty, open anterior capsular release, radial head excision, and in situ ulnar nerve decompression. AR at 157-159. Mr. George then participated in physical therapy. AR at 224–232. Despite these efforts, he continues to complain of pain and severely restricted range of motion. AR at 213 *et seq*. He has been diagnosed with severe end stage degenerative arthritis. AR at 237, 239.

Mr. George also complains of frequent pain and discomfort in his left shoulder, pain in his right knee, and pain and restricted range of motion in his hip due to malunion of the iliac wing and segmental malunion of the femur. AR. 214, 218, 233, 239. He has been prescribed high doses of Ibuprofen to treat the pain associated with these injuries and the arthritis in his elbow. *Id*. at 214, 218, 219, 223.

On January 31, 2000, Mr. George presented to Dr. Chadwick, for a follow-up on his elbow AR 219. Dr. Chadwick noted that surgery had clearly improved Mr. George's ability to rotate, flex, and extend his elbow. *Id*. Examination revealed Mr. George had 30 to 80 degrees range of motion in his elbow and about 45 degrees range of motion in pronation and supination *Id*. It was also noted that Mr. George had end stage arthritis in his elbow .*Id*. Mr. George returned to Dr. Chadwick on August 2, 2000, for a follow-up appointment. AR 218. Dr. Chadwick noted that Mr. George had a

---

[4]There is a typographical error in this medical record which indicates the motorcycle accident occurred in 19<u>9</u>4. The record otherwise suggests the accident occurred in 19<u>8</u>4. AR 155, 222.

new job, was lifting up to 70 pounds, and that his elbow was sore. *Id*. Examination revealed 40 to 80 degrees range of motion and about 60 degrees range of motion in pronation and supination. AR 218. Dr. Chadwick assessed degenerative arthritis of the elbow and opined that Mr. George might be a candidate for distraction arthroplasty surgery *Id*..Dr. Chadwick also indicated Mr .George should not do heavy lifting *Id*.

On November 15, 2000, Mr. George presented to the Allina Medical Clinic (AMC) for a follow-up on his attention deficit disorder (ADD). AR 217. Mr. George reported he had started Dexedrine and that he was more alert, better focused, and able to complete tasks. *Id*. Mr. George returned to AMC on February 8, 2001, for a follow-up appointment. AR 215. He reported his ADD medication was effective and that he was doing "really good" on his depression medication (Paxil). AR 215. Mr. George presented to AMC on April 25, 2001, with complaints of left shoulder pain. AR 214. He stated that he had been swinging his 50 pound son in his arms, and noticed pain the next morning. *Id*. Examination revealed Mr. George was not in acute distress and that he had good range of motion of the shoulder. AR 214. He was assessed with left shoulder pain and advised to follow up with physical therapy . AR 214.

Mr. George returned to AMC on July 26, 2002, for a recheck of his depression and ADD. AR. 212. He reported he had quit using his medication some time ago.*Id*. He stated that he was depressed, had no ambition or motivation, and had problems focusing and concentrating. *Id.*. Mr. George was diagnosed with depression and ADD and restarted on Paxil and Dexedrine. *Id*.

Mr. George returned on August 30, 2002, for a recheck on his depression and ADD. AR 211. He reported he felt much better on his medication and he was not as depressed. *Id.*. He did not believe his ADD was under control, however, and he continued to feel distracted and disorganized. He wanted to increase his Dexedrine dose. *Id*. It was noted Mr. George's depression was improving, and he was advised to return in six months. *Id*.

### 2.    Project Turnabout

On October 24, 2002, Mr. George was admitted for inpatient treatment for chemical and alcohol dependency. AR 240-42. On November 15, 2002, he left the treatment facility and was

5

discharged against staff advice. AR 240.   At the administrative hearing, Mr. George explained he left the facility because he believed they used an "attack approach." AR 390. He didn't think it was helping him, so he left. *Id.*

### 3.   Dr. Stacie Lenssen–South Dakota Disability Determination Services

On June 1, 2004, Mr. George underwent an evaluation with Dr. Stacie Lenssen at the South Dakota Disability Determination Services. AR. 249-253. Examination revealed symmetric reflexes; normal range of motion of the back; 30-80 degrees range of motion for flexion and extension of the left elbow; 45 degrees range of motion of pronation and supination of the left elbow; normal bilateral wrist and finger limits; normal range of motion of the right shoulder; positive impingement signs of the left shoulder; full strength and hand grip of the right upper extremity; normal fine manipulation on the right; and normal hand grip and wrist strength on the left. AR. 252. Examination further revealed no swelling or erythema in the hip joints; pain in the left hip with external rotation; and a normal right hip. AR. 252. X-rays of the right knee were normal. AR. 254. Dr. Lenssen noted that Plaintiff had good dexterity in his hands and wrists. AR. 253. Dr. Lenssen noted early degenerative changes and possible laxity in Mr. George's right knee, degenerative joint disease in his left hip, and nerve impingement and possible rotator cuff involvement in his left shoulder. *Id.*   Dr. Lenssen concluded as a result of these injuries, Mr. George is limited in his ability to lift and carry objects, he must change positions frequently, he should limit walking and standing to four hours or less in an eight-hour workday, his ability to stoop and kneel are limited, and he will have difficulty manipulating bigger objects due to the restricted range of motion in his left elbow. *Id.* Dr. Lenssen did not assess Mr. George's mental and emotional issues.

### 4.   Dr. Frederick Entwistle–Non-Examining/Non-Treating State Agency Consultant

On July 2, 2004, Frederick Entwistle, M.D., a State Agency medical consultant, reviewed Mr. George's records at the request of the Commissioner and completed a Physical Residual Functional Capacity Assessment form. AR 255-62.   Dr. Entwistle's primary diagnosis was "s/p fracture l femur and left elbow" and his secondary diagnosis was "degenerative arthritis left elbow." He listed other alleged impairment as "history adhs, depression, alcohol abuse." AR 255.   Dr. Entwistle determined Mr. George could occasionally lift 20 pounds, frequently lift 10 pounds, stand

6

and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. AR 256. He also determined Mr. George should be limited to occasional overhead activity with the left upper extremity and had unlimited abilities for handling and fingering. AR 258. Dr. Entwistle noted Mr. George's complaints of pain and self-limitation of activities seemed somewhat disproportionate to the objective medical records. AR 260. As evidence in support of his opinions, Dr. Entwistle stated:

> 38 year old male with history of motorcycle accident in 1984 causing fracture pelvis, fracture left femur, and open fractur-dislocatio (sic) of his left elbow. Developed degenerative arthritis of the elbow and underwent ulnohumeral arthroplasty, radial head excision, with anterior capsule release and ulnar nerve decompression of the left elbow on 7-29-98. Review of records reveals treatment for ADHD. Depression and anxiety. Also history of tobacco, and alcohol abuse. Surgeon's post op exam of left elbow of 1-31-00: "continues to work doing some siding" ROM 30 to 80. Distal neurovascular was intact. M.D. offered an elbow injection but the patient felt his pain was not that bad. He states he does household repairs, sweeps floor, picks up lawn. Says has pain in knee, hip, elbow and shoulder. Exam 6-01-04: back non-tender, no muscle spasms, with normal range of motion. Right hip normal to exam with some pain and some limited motion of left him. Left knee normal to exam. Some tenderness medial joint right knee with apparently some laxity in the ACL. Right elbow is normal to exam. Left elbow 30-80 degrees ROM. Wrists and fingers are normal to exam bilaterally. Also had normal hand and wrist strength on the left. Elbow strength felt to be fairly intact. Has pain with abducted extension L shoulder. X-rays 5-24-04 Right knee normal; left hip shows no joint space narrowing, with healed fracture of left femoral shaft noted.

AR 256-57.

## B.    Mental and Emotional Conditions and Treatment

### 1.    Nina Povlitzki, Licenced Psychologist

In 1999, Nina Povlitzki, a licensed psychologist, completed a psychological assessment of Mr. George. AR. 206-10. Ms. Povlitzki administered the Wechsler Adult Intelligence Scale Test, and Mr. George obtained a verbal IQ score of 93, a performance IQ score of 89, and a full scale IQ score of 91, indicating an average range of intellectual functioning. AR 206. Intelligence testing also reveals Mr. George has a learning disability in the area of written language. AR at 208. Mr. George was also administered the Conners' Performance Test and obtained scores which suggested he did not have significant attention difficulties. AR. 207. Ms. Povlitzki diagnosed attention deficit

7

hyperactivity disorder (ADHD) and a major depressive episode. AR 210. She also determined Mr. George's current global assessment of functioning (GAF)[5] score was 65.

### 2.   James N. Butcher, PhD

In 1998, Mr. George was administered the MMPI-2 by Dr. James Butcher. AR 160-178. Noted as "critical items" were acute anxiety, depressed suicidal ideation, threatened assault, situational stress, mental confusion, persecutory ideas, antisocial attitude, family conflict, somatic symptoms, and sexual concern. AR 172-75.

### 3.   Robert Packard, PhD–Consulting/Treating Therapist

In July of 2004, Mr. George was referred to Robert G. Packard, Ph.D. at the Human Services Center in Watertown, by South Dakota Disability Determination Services for a consultative examination. AR. 290. Mr. George reported to Dr. Packard that he (George) helped care for the family's sheep and chickens, as well as tending to the vegetable garden. AR 291. Mr. George also reported that he took care of his dog. *Id.* He also told Dr. Packard that he drove his father to therapy, did his laundry, and was working on building a deck. *Id.* He reported lifting limitations in association with chronic pain, but no other limitations in self care or activities of daily living. *Id.* Dr. Packard's examination revealed Mr. George's affect was appropriate, speech and perceptions were normal, associations were logical and concentration was acceptable. AR 291. Dr. Packard initially diagnosed Mr. George with moderate depressive disorder, generalized anxiety disorder with panic symptoms, and alcohol dependence in early remission. AR 288.

Dr. Packard continued to counsel Mr. George into October, 2004, and later reported his panic condition was more severe than originally noted, and it functionally immobilizes him from

---

[5]GAF stands for Global Assessment of Functioning. A rating of 60-65 indicates "**some mild symptoms** (e.g. depressed mood and mild insomnia) **OR some difficulty in social, occupational or school functioning**(e.g. occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders, at p. 32 (4th Ed. 1994) (emphasis in original).

leaving the home. AR 281. Dr. Packard specifically noted Mr. George missed two sessions because of panic attacks. *Id.* Another time, Mr. George had to ask his brother drive him to his session. AR 285. Due to Mr. George's fear of driving, he eventually began treating with Ronald Flemming, a counselor with Lutheran Social Services (LSS) in Sisseton, South Dakota. AR at 139.

### 4. Ronald Flemming–Licensed Professional Counselor of Mental Health, Lutheran Social Services

Records from LSS indicate Mr. George treated with Ronald Flemming from October, 2004 through November, 2004. AR 293-299. (Mr. George treated at LSS beginning in March, 2004). AR 301. Mr. Flemming noted Mr. George was depressed and anxious and that he had concentration problems, but he assigned a GAF of 60. AR 293. On November 1, 2004, Mr. Flemming reported that Mr. George's fear and anxiety caused him to isolate himself, obsess to the point he is not able to sleep, and avoid people and social situations. AR 296-297. Mr. Flemming later confirmed Dr. Packard's diagnosis of Depressive Disorder NOS, Anxiety Disorder NOS, and Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Type. AR 154. Mr. Flemming explained that the depressive disorder and anxiety disorder resulted in marked restriction of activities of daily living, difficulties in maintaining social functioning, and maintaining concentration, persistence or pace. *Id.*

### 5. Center for Family Resources–Paul Hildebrant–PhD

On September 10, 2001, Plaintiff was administered the Conners' Continuous Performance Test (Tr. 198-205). Plaintiff's responses to questions were inconsistent or variable and indicated difficulties in maintaining attention (AR 201). In the "overall comment" section of the test, the evaluator stated "numerous indices from the Conners' Continuous Performance Test suggest that David George has attention problems. There is strong evidence from the Conners CPT to suggest attention difficulties." AR 202.

### 6. Richard Gunn, PhD–Non-Treating, Non-Examining Consultant

On August 8, 2004, Richard Gunn, Ph.D., reviewed Mr. George's records at the request of the Commissioner and completed a Mental Residual Functional Capacity Assessment form and a

Psychiatric Review Technique form.  AR 263-80.  Dr. Gunn determined Mr. George's ability to understand, remember and carry out short and simple instructions was not significantly limited.  AR 263.  He further determined Mr. George's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was not significantly limited.  AR 264.  Dr. Gunn determined Mr. George's mental impairments did not meet or equal a listing ( AR. 267) and that his mental impairments resulted in mild restriction of daily living activities; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation.  AR 277.  In the section entitled "consultant's notes" Dr. Gunn listed the following:

> This is a 38 year old male with a history of alcohol dependence.  Last treated in 2002.  History of MVA in 1984 but has worked since then.
>
> Psychological Evaluation 2/99
> WAIS -III
> VIQ-93
> PIQ-89
> FSIQ-91
>
> Reading–93
> Math–92
> Written-72
>
> says results do not support ADHD
> dianosi of MDD and ADHD
>
> Psychological Evaluation of 7/6/04
> cares for sick parents
> building a deck at their home
> no limitations in his ADL's
> MDD-moderate
> GAD
> Alcohol dependence in early remission
>
> DAQ-self
> cares for all personal needs
> attends church
> is social
> c/o short attention span

10

DAQ-mother
seems preoccupied
needs some reminders
has a fear of accident if driving while intoxicated
JPQ-only work for 30 days for them
problems with change
would not write needed information down

### 7. Robert Behrns, M.D. -Non-Treating, Non-Examining Consultant

On December 27, 2004, Robert Behrns, M.D., reviewed Mr. George's records at the request of the Commissioner and completed a Mental Residual Functional Capacity Assessment form and a Psychiatric Review Technique form. AR 305-22. Dr. Behrns determined Mr. George's ability to understand, remember, and carry out short and simple instructions was not significantly limited and that he was capable of sustaining simple work. AR 305-07. He further determined that Mr. George's mental impairments resulted in mild restrictions of daily living activities; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation. AR. 319. In the "consultant's notes" section of the form, Dr. Behrns listed the following:

39 yo man
AOD 7-DO
4-14-04 pain questionnaire—lost job due to pain & Drs limits.
ADLs-no mention anxiety till end of form # 26 & 27-then no specifics.
Used to take Dexedrine
Work assessment 3-15 to 4-15-03
slow, not too enthusiastic about work
ask many ?s
very well with coworkers & employer/supervisor
"Prob with stress—upset with customer
memory problem
too slow
never really wanted to work too much
ADLs undated (different handwriting from 4-14-04 so it seems)
#23 show attn span—ADD
Mother—
better before motorcycle accident '84
physically & better attn span _____accident
too preoccupied to fix meals (doesn't coincide with clts ADL comments)
afraid to drive
AA meetings

11

CL–getting tx for ADD & anxiety
(Initial level-no co anxiety)


### C.      Plaintiff's Hearing Testimony

The administrative hearing was held in Aberdeen, South Dakota on March 10, 2006. AR 334. Mr. George testified that he was then single and 40 years old. AR 338-39. He had lived with his parents for about two years. AR 339. His parents are disabled. AR 345. Before that, he lived in North Dakota for a while, and in Rapid City, South Dakota for a while with his brother. *Id.* He also lived in Remer, Minnesota for about three months. *Id.* He has three children. Two are adults. The third is twelve, and he spends the summers with Mr. George. AR 345.

Mr. George did not complete high school and did not receive a GED. AR 339. He attended a vo-tech school after his motorcycle accident. AR 390. He did not get a diploma at his graduation from the vo-tech program, however, because he had never gotten his GED. AR 398. He can read, but has problems writing and spelling. AR 340. He's had a checking account in the past, but he does not anymore because he had too many problems writing bad checks. AR 341. He is right handed. *Id.* He believes he is unable to work because if he sits or stands too long cause him severe pain from his past injuries. He last worked as a bartender in 2003 or 2004. AR 342. That job lasted one month. *Id.* The job ended because of "anxiety and panic" AR 342. Mr. George explained that it was "just way too much information" and he could not remember what people said. *Id.*

After Mr. George got divorced his mother lent him money, then he went to stay with his brother. AR 343. He participated in vocational rehabilitation in Blaine, Minnesota in 2001. *Id.* Before he completed that effort, however, he moved. AR 344. He remembers being told after taking one diagnostic test that he had attention deficit. *Id.* Then he received a prescription for attention deficit and depression. *Id.* He believes the prescription medication helped those issues. *Id.*

Mr. George helps his parents around the house. AR 346. He walks beside his mother so she does not fall. *Id.* He mashes potatoes for her. *Id.* She does the dishes. His dad does not do much except watch T.V. and play cards. *Id.* He does help his dad put on his coat and walk. *Id.* His father

drives. *Id.* Mr. George does not drive much anymore for two reasons: he is afraid of driving and he does not have a license. AR 346-347. He has not had a license since 2003. He could not renew it because he owes back child support. AR 347. He sweeps and mops the floor "now and then" but otherwise his mother does the cooking and cleaning. AR 364. He said he could do household chores like washing dishes, vacuuming, sweeping, and laundry "a bit" AR 364. His father does the yard work. AR 365. He had a garden in the past but not anymore because he lost interest in it. *Id.* His brother shovels the snow. AR 366. He has a pet dog that he cares for. AR 367. When his son visits he takes his son fishing, but he does not fish. AR 368. He went duck/goose hunting twice last year. AR 368-69. When he goes to the grocery store with his parents, he prefers to stay in the van with his dad. AR 370. He goes to church, but he does not go to the mall or Wal-Mart. *Id.*

As of the hearing date, Mr. George took two prescription medications: Paxil and Dexedrine. AR 348. If he drinks too much coffee along with taking his Dexedrine, it causes him more anxiety. AR 349. Sometimes he forgets to take his Paxil. *Id.* If he misses a few days and then starts again, the Paxil can cause him nausea and diarrhea. *Id.* He is supposed to take Paxil daily, but because of the side effects of his irregular use, it takes him 45 or 50 days to use a 30 day prescription. AR 350. He estimated it was about the same with the Dexedrine. *Id.* Mr. George explained he does not purposely refuse to take his medication, he just forgets. AR 349-50. He also takes Ibuprofen daily for pain. AR 351.

Mr. George's last full-time employment was as an order picker for ABC Supply Company in Minneapolis, Minnesota. TR 352. That job consisted of gathering materials for orders and loading them onto trucks for delivery. *Id.* His doctor (Chadwick) recommended that he stop doing that type of work and limit himself to sedentary work because of his physical condition. AR 353. When Mr. George told his work supervisors about his physical limitations, he was fired. *Id.*

Before the warehouse job, Mr. George was self-employed as a disc-jockey. AR 353. When he worked as a disc-jockey he lived in the Milbank-Sisseton area. AR 354. He quit disc-jockeying when he moved away from the area. *Id.* He does not believe he could do that job anymore because he has developed a fear/phobia of people and he does not like to drive. AR 354-55. He is afraid

another drunk driver will run into him.  AR 355.

Other previous employment included a working as a janitor, a salesman for a home improvement business, telephone marketing for a home improvement business, and installing siding. AR 357-58.  He could not continue installing siding because he was physically incapable of the work. AR 359.  He also sold advertising for a radio station.  AR 360.  He does not believe he could do that job anymore even if he had a driver's license, because he does not believe he is mentally or emotionally capable of handling a sales job.  *Id.*

Mr. George testified that he treated with Dr. Packard at the Human Services Center in Watertown just a few days before the hearing. [6]  He missed some of his appointments with Dr. Packard because he did not think he should travel in the weather, and because Dr. Packard challenged him to drive to his appointment by himself, but he got halfway there and panicked and turned around.  AR 393.  It was Mr. George's recollection that Dr. Flemming told him he had "full fledged" ADD and depression.   AR 363.

When asked what he does to fill his time, Mr. George said "not much." AR 363.  He said "this isn't the life I want . . . this isn't even close to the life that I thought I would be living when I got this age . . . .I'm ashamed." AR 363.  He said he lives off "a little change maybe my mom gives me . . . disgusting." AR 364.  He testified that he had been in "treatment" twice and domestic abuse classes twice.  AR 372.  He started drinking again after his second treatment, but then got himself back into AA.  *Id.*  He estimated he'd been sober since "probably 2000, 2001." AR 373.[7]  Before that he was sober for ten years.  *Id.*  He goes to AA meetings once a week or once every other week. AR 374.

---

[6]The most recent medical record from Dr. Packard which is contained in the record is from November, 2004.  The hearing was held in March, 2006.

[7]When the ALJ pointed out that Mr. George's most recent inpatient treatment occurred in 2002, Mr. George said "I don't . . .I thought I was sober from the year 2000.  That's what I was thinking." AR 389.

Mr. George's typical day (which he characterized as "disgusting") consists of getting up, drinking coffee and smoking cigarettes with his parents. AR 378. He smokes a pack a day. AR 379. He does not watch much T.V. AR 378. He usually does not each much until about 3:00 in the afternoon. AR 380. He helps his parents around the house, listens to his stereo, and feeds his dog. AR 381. Sometimes his friend comes to get him and they go into town and drive around. AR 384. He has a computer but he had not really figured out how to use it. AR 385.

It is Mr. George's understanding that as a result of his motorcycle accident, his left leg is 5/8" shorter than his right leg. AR 396. Mr. George estimated he can sit for about two hours, stand for two hours, and walk far enough to get the mail before causing him too much pain. AR 386. With his right arm he can lift a fifty pound sack of dog food if he uses his whole body to do it. With his left arm he could maybe lift ten pounds, but he gets "jolts." AR 387. If he has to he can carry something that weighs fifty pounds in both arms, but "I ain't going to carry it very darn far." AR 387.

## D.    Vocational Testimony

A vocational expert (VE) (Warren Haagenson) testified at the administrative hearing. AR 400. The ALJ described three hypotheticals to the VE. The first hypothetical asked the VE to assume Mr. George's hearing testimony was fully credible. AR 402. Given that hypothetical, the VE stated Mr. George could not perform any of this past relevant work or any other work because of his inability to stay focused for the duration of an eight hour work day. *Id.*

The ALJ's second hypothetical asked the VE to assume an individual of Mr. George's age, education, past relevant work experience and impairments described by Mr. George. The ALJ asked the VE to further assume the physical limitations assigned by Dr. Entwistle's July 2, 2004 functional capacity assessment (occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk/sit with normal breaks for 6 hours out of an 8 hour work day, limited overhead reaching on the left, no limitations on the right upper extremity, no use of ladders, ropes, or scaffolds, frequent climbing of ramps and stairs, frequent balancing, stooping, kneeling, crouching and crawling. The ALJ also adopted the mental limitations assigned by Dr. Richard Gunn's August 4, 2004, mental residual

15

functional capacity assessment (consistent with the ability to work so long as work is performed in one and two stage commands). The ALJ also asked the VE to assume Mr. George would be limited to brief and superficial contact with the public, coworkers and supervisors. Given that hypothetical, the VE stated Mr. George would not be capable of any of this past relevant work, because his past relevant work required more than two steps. AR 403. The VE explained, however, that other jobs exist in the economy which fit the hypothetical. Those jobs include small parts and bench assembly type work, numbering 410,000 in the national economy. AR 403. Another job which fits into the category is motel cleaner. *Id.* There are 400,000 of those jobs in the national economy. *Id.*

The ALJ's third hypothetical asked the VE to assume the same facts as the second hypothetical except that Mr. George would be limited to standing and walking four hours per day. AR 404. The VE stated this, along with the limitation of one or two steps and limited interaction with the public, supervisors and co-workers would limit Mr. George to sedentary, manual work such as small parts assembly type jobs. There are 150,000 of those type jobs in the national economy. On cross-examination by Mr. George's counsel, the VE explained that if Mr. George is unable to use his left hand in the small assembly position, those positions would not be viable. AR 405. The ALJ also clarified that Mr. George will need to be able to frequently reach with his left arm for the small assembly position. AR 409. Finally, the ALJ also explained that if Mr. George's mental condition caused him to miss work two or three times per month, he would not be able to sustain gainful employment. AR 406.

### E.    Other Evidence–Third Party Statements

The record also contains third party statements from persons who did not testify at the hearing. These written statements were submitted to the Social Security Administration and were available for ALJ Geyer's consideration:

### 1.    Linda McAllister

Ms. McAllister submitted a letter dated March 10, 2006. She has known Mr. George for twenty-two years. AR 156. She explained she was one of Mr. George's high school classmates. AR 155. She knew him before and after his 1984 motorcycle accident. She said that  he slowly

16

healed and tried to move on with his life, but "was never the same guy that I knew in 1983." *Id.* She believed he was impaired, slow in his thinking, had obsessive thoughts, and has post-traumatic stress as a result of the accident in which his friend was killed. *Id.* She described a man who has tried but failed at many jobs. *Id.* She also believes he is very fearful and insecure. AR 156. She explained that he was once on disability, and could have continuously remained on the program but instead tried to provide for his family. His efforts to sustain employment ultimately failed because of his inability to focus. *Id.* Ms. McAllister believes Mr. George is "disabled in every sense of the word." *Id.*

### 2.   Denise Krause

Ms. Krause completed two questionnaires–both on May 12, 2004. She completed a "Function Report Adult–Third Party" (AR 115-123) and a "Job Performance Questionnaire." AR 108-114. Ms. Krause listed herself as "bar owner" on the Job Performance Questionnaire (AR 108) and as "friend" on the Third Party Questionnaire. AR 115.

In the Job Performance Questionnaire, Ms. Krause indicated Mr. George worked for her for one month (March-April) in 2003. He tended bar, waited on tables and served customers. AR 108. She said Mr. George never really "got into" the job much. *Id.* He did have to take breaks to rest his hip and knee. AR 109. He could not maintain an ordinary work routine without supervision. He needed repeated instructions about what needed to be done. *Id.* He interacted fine with supervisors and co-workers, but he was too slow and needed too much instruction. *Id.* He did not react well to changes because he got confused and could not remember things. *Id.* He did not handle work-related stress well, and once isolated himself for a period of time after becoming upset with a customer. AR 110. His co-workers would simply walk around him as he stood and tried to think of what he was supposed to be doing. *Id.* He left employment because he just could not handle the job. She would not hire him back because he could not do the work and could not keep up with the pace required. *Id.*

In the Function Report Adult-Third Party (AR 115) Ms. Krause indicated she had known Mr. George for two years. She said Mr. George took care of his son when the son came to visit, and took

care of his dogs. AR 116. She was unaware of his abilities regarding activities of daily living. *Id.* She did not believe he cooked his own meals. AR 117. She did not believe he drove because of an expired license. AR 118. She listed church and AA meetings as places he went on a regular basis. AR 119. She noted that when he was on his feet a lot he limped or sat down. AR 120. In her opinion, his memory was "really bad" and he could pay attention for "not very long." *Id.* She said he was respectful of others, but did not finish what he started, and had trouble following instructions. *Id.* When asked whether she had noticed any unusual behaviors or fears, she said, "I think he is very insecure and acts to me as he is afraid of being hurt in some way–I can't really explain." AR 121.

### 3.    Darla George

Mr. George's mother, Darla, wrote a letter to the Administration dated March 8, 2006. AR 149. She explained that Mr. George has difficulty concentrating and thinking clearly. She says he is easily distracted, forgets things, and has a lot of anxiety and stress. He is depressed. He has frustration and "silent rage." He takes medication, but he has a hard time remembering when to take the medicine and how much to take. *Id.* She is concerned for his health and well-being. *Id.*

Mrs. George also completed a "Function Report Adult–Third Party" dated May 15, 2004. AR 124-132. She described his daily activities as drinking coffee, interacting with his dog, and helping with small tasks around the house. AR 124. She explained that sometimes he needed help getting dressed. AR 125. She also said he needed reminders to take his medication. AR 126. He did not prepare his own meals. *Id.* Mr. George was able to help around the house by sweeping, doing dishes, "some" yard work, and helping with the sheep. These chores were done in five to fifteen minute increments, with the yard work being "sporadic." AR 126. He needed "constant reminders" to help. *Id.* She said he did not drive because he was afraid to do so, and he did not have a license. AR 127. The only places he went on a regular basis were AA meetings and church. AR 128. She thought his attention span was very short. AR 129. He did not follow verbal instructions well. *Id.* She believed he isolated himself and had a fear of being in another car accident. AR 130. She explained his physical and mental limitations and she perceived them on the last page of the form. AR 131. Prolonged sitting or standing caused pain, and his memory and concentration were

very limited. *Id.*


## DISCUSSION

### A.     Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted).   In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf*, 3 F.3d at 1213.   The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. *Id.*   If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).


The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

**B.     The Disability Determination and The Five Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

> **Step One:**   Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.
>
> **Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).
>
> **Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

20

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.      Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

## D.      The ALJ's Decision

The ALJ issued an eleven page, single-spaced decision on May 22, 2006. The ALJ's decision discussed steps one through five of the above five-step procedure.

At step one, the ALJ found Mr. George had not engaged in substantial gainful activity since his alleged onset date. AR 16.

At step two, the ALJ found Mr. George has the following severe impairments: status post fracture of the left femur and left elbow, degenerative arthritis of the left elbow, attention deficit disorder, an affective disorder, and an anxiety related disorder. 20 C.F.R. §§ 404.1520(c) and 416.920(c). AR 16.

21

At step three, the ALJ found "the Claimant does not have an impairment or combination of impairments that meets or  medically equals  one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). AR 17..

At step four, the ALJ found Mr. George's allegations regarding the intensity, duration and limiting effects of his symptoms were "not entirely credible." AR 20.  While the ALJ considered the lay witness statements in the file he found "that they do little to bolster the claimant's credibility regarding a total inability to engage in substantial gainful activity." AR 22.  The ALJ assigned an RFC of a "significant range of light work" with limited reaching in all directions with the left upper extremity and the preclusion of climbing ropes, ladders or scaffolds.  This RFC  adopted the non-treating, non-examining physician imposed restrictions. AR 22.  He also adopted the additional restrictions assigned non-treating, non-examining physicians regarding Mr. George's mental impairments–namely that he could perform jobs involving one or two step tasks and limited to only superficial contact with supervisors, co-workers and the public, but his mental condition was otherwise compatible with competitive employment. AR 22.  The ALJ determined Mr. George was not capable of any of his past relevant work.  AR 23.

At step five, the ALJ determined Mr. George  is capable of other substantial gainful employment.  Specifically, the ALJ determined Mr. George  is capable of working light un-skilled jobs such as a small parts or bench assembly worker or a motel cleaner. AR 24.  As such, the ALJ determined Mr. George  is not "disabled." *Id.*

E.      **The Parties' Positions**

Mr. George  asserts the ALJ erred by finding him not disabled within the meaning of the Social Security Act.  He asserts the ALJ erred in three ways: (1) by concluding that none of his impairments meet or equal an impairment listed in Appendix 1, Subpart P, Regulation No. 4;  (2) by improperly determining his RFC; and (3) by concluding at Step Five that he retains the RFC to perform jobs that exist in significant numbers in the national economy.  The Commissioner asserts his decision is supported by substantial evidence on the record and should be affirmed.

**F.     Analysis**

The three analytical errors Mr. George asserts infected the ALJ's ultimate "not disabled" conclusion will be discussed in turn:

**1.     Whether Any of Mr. George's Impairments Meet or Equals a "Listing"**

The ALJ analyzed both Mr. George's physical impairments and his mental impairments, but determined that none of them met or equaled a "listing." The physical impairments were evaluated under Section 1.02 (major dysfunction of a joint due to any cause). The mental impairments were evaluated under Sections 12.02 (organic mental disorders); 12.04 (affective disorders); and 12.06 (anxiety related disorders).

**a.     Physical Impairment**

The ALJ stated:

> In considering the claimant's degenerative elbow arthritis and his history of elbow and femur fracture, under section 1.02 of the listed impairments the undersigned notes there is no evidence of an inability to ambulate effectively or an inability to perform fine or gross movements as required by the listing.

In order to qualify for disability benefits under Step Three of the analysis, the claimant must present medical findings equal in severity to *all* the criteria for the listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The requirements for a muscoloskeletal listing under 1.02 requires major dysfunction of a joint due to any cause and either involvement of one major peripheral weight-bearing joint, resulting in an inability to ambulate effectively, or involvement of one major peripheral joint in *each* upper extremity, resulting in the inability to perform fine and gross movements effectively.

The inability to ambulate effectively is defined in the regulations at 20 C.F.R. pt. 404, subpt. P. App. 1 § 1.00(B)(2)(b). The inability to ambulate effectively means "an extreme limitation of the ability to walk; . . . ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand held assistive device that

23

limits the functioning of both upper extremities . . . to ambulate effectively individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must be able to have the ability to travel without companion assistance to and from a place of employment or school."

Although he stated he does need frequent rests, Mr. George did not present any medical evidence that he is unable to ambulate effectively. While his treating physicians have limited his walking to four hours per day, none have prescribed assistive devices. Mr. George has himself stated that he does not require assistive devices for ambulation (AR 90) and testified he is able to walk to get the mail without pain (AR 386).

The regulations define the inability to perform fine and gross movements effectively at 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(B)(2)(c). The definition requires an "extreme loss of function of both upper extremities; i.e. an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living."

Mr. George presented no medical evidence of extreme loss of function in his right upper extremity. His hearing testimony is also inconsistent with extreme loss of function of the right upper extremity. AR 387. The ALJ's determination, therefore, that Mr. George's physical impairments did not meet or equal a listing is supported by substantial evidence.

### b.     mental impairments

The ALJ stated:

[T]he undersigned finds that the claimant's attention deficit disorder, affective disorder, and anxiety-related disorder satisfy the "A" criteria of [sections 12.02,12.04, and 12.06]. However, in assessing the claimant's "B" criteria, the undersigned will concur and adopt the State Agency physicians (sic) opinions as found at Exhibits 11F and 15F that the claimant exhibits "mild" restrictions of activities of daily living; "mild" difficulties in maintaining social functioning; "moderate" difficulties in maintaining concentration, persistence or pace; and "no" episodes of decompensation.

24

> The undersigned further finds that the evidence does not establish the presence of the
> "C" criteria.

AR 18. ALJ Geyer found Mr. George met the requirements of section A in Listings12.02, 12.04, and

12.06, and this finding is not in dispute.  Mr. George asserts, however, that he also meets the criteria

in section B of each of these listings.

Under section B, Mr. George  must demonstrate his attention deficit disorder, affective

disorder, and/or anxiety-related disorder result in at least two of the following:**1**. Marked restriction

of activities of daily living;**2**. Marked difficulties in maintaining social functioning;**3**. Marked

difficulties maintaining concentration, persistence, or pace; or; **4.** Repeated episodes of

decompensation, each of extended duration.

In finding that Mr. George does not meet the "B" criteria, the ALJ adopted the findings of the

non-treating, non-examining State Agency physicians (Richard Gunn and Dr. Behrns) who opined

Mr. George sustained only "mild" or "moderate" limitations in the above categories.  *See* AR 277,

319.  Opinions of doctors who have not examined the claimant ordinarily do not constitute substantial

evidence on the record as a whole.  *Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002);

*Shontos v. Barhnart*, 328 F.3d 418, 427 (8th Cir. 2003).

Also, 20 C.F.R.  § 404.1527(d) provides the factors to consider  for assigning weight to

medical opinions. That regulation provides:

> (d) How we weigh medical opinions.  Regardless of its source, we will evaluate every
> medical opinion we receive.  Unless we give a treating source's opinion controlling
> weight under paragraph (d)(2) of this section, we consider all of the following factors
> in deciding the weight we give to any medical opinion.
> (1) Examining relationship.  Generally, we give more weight to the opinion of
> a source who has examined you than to the opinion of a source who has not examined
> you.
> (2) Treatment relationship.  Generally, we give more weight to opinions from
> your treating sources, since these sources are likely to be the medical professionals
> most able to provide a detailed, longitudinal picture of your medical impairment(s)
> and may bring a unique perspective to the medical evidence that cannot be obtained
> from the objective medical findings alone or from reports of individual examinations,
> such as consultative examinations or brief hospitalizations.  If we find that a treating

25

source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(l) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(l) Length of treatment relationship and frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a Non-Treating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s)the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****. When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a Non-Treating source.

(3) Support ability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.[8]

(6) Other factors. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of

---

[8]Mr. Flemming is a licensed mental health counselor. Dr. Packard is a licensed psychologist and a PhD. The records does not make clear the specialties of the State Agency Consultants (Dr. Behrns and Richard Gunn).

which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

First, Mr. George's treating mental health counselor, Ron  Flemming, wrote a letter dated March 8, 2006 (AR 154) stating that Mr. George's depressive disorder (12.04) and his anxiety disorder (12.06) resulted in marked: 1) restriction of activities of daily living; 2) difficulties in maintaining social functioning; and 3) difficulties in maintaining concentration, persistence or pace. Dr. Flemming's comments were based on information gathered during psychotherapy sessions from March, 2004 through December, 2004.  AR 154.  Dr. Flemming's observations  are also consistent with statements made by Mr. George's other treating psychotherapist (Dr. Packard).  Dr. Packard issued a report dated July 6, 2004 (AR 290) in which he described Mr. George as having cyclical mood changes from "enthusiastic and energized to depressed an immobilized." AR 292.  He also described "attention deficit disorder" and "strong anxiety reactions, with panic symptoms, relating to driving a car and engaging socially." *Id.*  When asked to update his report in November, 2004, Dr. Packard stated, "since then [referring to July, 2004] I have  seen David twice & I find his panic condition to be more severe than originally noted, functionally immobilizing him from leaving home. (He missed 2 sessions with me because of panic–he got halfway then turned back).

The ALJ rejected Ron Flemming's observations  because he found them internally inconsistent with the  assignment of a GAF of 60.  Other than the GAF, the remainder of Ron Flemming's observations were completely consistent with the other record evidence.  The ALJ erred, therefore, by "simply disregarding the entirety of [the treating physician's] opinion, particularly when [the treating physician] otherwise consistently documented [the claimant's] disabilities." *Duncan v. Barnhart*, 368 F.3d 820, 824 (8th Cir. 2004). [9]  The "marked" limitation assignment is supported by

---

[9]In *Duncan* the ALJ rejected the treating physician's opinion because the treating physician opined the claimant could be expected to be absent more than three times per month

other record evidence:

**Activities of Daily Living**: Mr. George is often unable to sleep because he obsesses to the point he is unable to do so. AR 94, 296. He is noncompliant with his medications because he simply forgets to take them. AR 349-50. He is not able to complete basic household tasks because he loses concentration and focus. AR 95-96, 112; 365. He does not do yard work and has lost interest in gardening. AR 365. Mr. George rarely watches television or listens to the radio because he quickly loses interest. AR 95-96, 112, 378, 381. When asked if he had a checking account, Mr. George said he could not keep it balanced on his own and had a history of writing bad checks. AR 341. His ability to participate in any activity that must occur outside the home, such as shopping, attending counseling and medical appointments, and visiting friends, is severely limited. AR 95,111, 139, 346, 370. Mr. George spends his days at home, alone or in the company of his parents. AR 379-80. These observations are consistent with those of the third parties, who observed that Mr. George does not cook or drive, and does not go out alone. (Statements by Ms. Krause, AR 117-119). She also explained that Mr. George has bad memory and often does not finish what he starts. AR 120.

**Social Functioning:** Mr. George's fear and anxiety cause him to isolate himself, obsess to the point he is not able to sleep, and avoid people and social situations. AR 296-297. As a result, he rarely leaves home except to attend church and AA meetings. AR 95-96, 370-71, 384. In March of 2003, while working as a waiter, Mr. George got so upset with a customer he had to isolate himself to calm down. AR 109-110. Mr. George's mother Darla explained that his contact with other people has declined as have his outside activities. AR 129. He has a short attention span and does not finish what he starts. *Id.* He does not handle stress or change in routine well. AR 130. He isolates himself, does not like to drive, and has fear of getting into an accident. *Id.*

---

and suffered significant mental impairments, yet assigned a GAF of 65. The Eighth Circuit stated "while Dr. Singh's current GAF of 65 may not have been consistent with the remainder of her opinion, the ALJ erred by simply disregarding the entirety of Dr. Singh's opinion, particularly when Dr. Singh otherwise consistently documented [the claimant's] disabilities." The same is true in this case. It is clear the treating physicians believe Mr. George suffers significant disabilities related to anxiety and depression. Those opinions should not be disregarded solely because a number assigned to the GAF rating is inconsistent.

28

**Concentration, Persistence, and Pace**: Mr. George's most recent, brief attempt to work (for someone who describes herself as his friend) failed because he could not maintain the pace required of the job, and he was easily confused and forgetful. AR 108-110, 342-43. He struggled at previous employment because he suffered depression and/or anxiety as a result of the tasks required of him. AR 359-60. As outlined above, Mr. George does  not  watch television, listen to the radio, or complete basic household tasks due to his inability to concentrate. AR 95-96, 112; 365, 368.

The ALJ's decision to disregard the treating physician's opinions and the third party statements regarding Mr. George's mental limitations in favor of non-treating, non-examining State Agency consultants is not supported by substantial evidence. There is, however, substantial evidence in the record that Mr. George's  affective disorder, and anxiety-related disorder result in " marked" limitation of three of the "B" criteria. The result, therefore, is that at Step Three of the analysis, Mr. George meets both the "A" and the "B" criteria  for Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders).

If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). Because the Commissioner erred in failing to find Mr. George  disabled at Step Three, no further analysis is necessary.

While Mr. George's treating medical providers' opinions, combined with the other record evidence, provides substantial evidence that Mr. George's condition  met or equaled a "Listed" impairment[10] it does not appear that any of them were specifically asked about the onset date.  Mr.

---

[10]The record evidence to support the "Listing" level impairment spanned over a one year time frame.  Denise Krause's description of Mr. George's failed one month work attempt was in March, 2003 (AR 108).  Dr. Packard treated Mr. George from July, 2004 through November, 2004.  AR 281-292.  Ron Flemming's treatment through Lutheran Social Services  spanned from March, 2004 until December, 2004.AR 154.   The Third Party statements by Mrs. George and

George has alleged an onset date of July 1, 2000; however neither Dr. Packard nor Ron Flemming –the medical professionals upon whose expert opinions he relies to establish the existence of his "Listing" level impairment--treated Mr. George until 2004.  While there is substantial evidence to establish that a Listing Level impairment existed for at least twelve months, remand is necessary for an appropriate assignment of an accurate onset date.  *See e.g. Karlix v. Barnhart*, 457 F.3d 742, 747 (8th Cir. 2006) (in determining date of onset, the ALJ should consider alleged date of onset, work history, medical and other evidence; if medical evidence is ambiguous the ALJ should obtain an expert opinion  from medical advisor to determine a medically reasonable date of onset).

## CONCLUSION

For the reasons discussed above, the Magistrate Judge respectfully makes the following RECOMMENDATION:

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. *Buckner v. Apfel*, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only  two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. *Id.*  Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." *Buckner*, 213 F.3d at

---

Ms. Krause were completed in May, 2004.  Mr. George's hearing testimony was in March, 2006 (AR 334-412).

1011. The record supports an award of benefits in this case.

Therefore, a remand for further administrative proceedings is appropriate. It is respectfully RECOMMENDED to the District Court, therefore, that the Commissioner's decision be REVERSED and REMANDED for an award of benefits pending a determination by the Social Security Administration regarding an appropriate date of onset, pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this 21st day of February, 2008.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk

By _____, Deputy

31